

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0563-19

### CASEY ALLEN MARTIN, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

**SLAUGHTER, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

When a firefighter, in the line of duty, asks law enforcement for a safety check after seeing drug paraphernalia, guns, and flammable liquids in an apartment, is the officer's entry into the apartment reasonable under the Fourth Amendment, and can that officer's discovery of drug paraphernalia in plain view provide probable cause for a search warrant? The short answer to this question under the specific facts of this case is yes. We therefore uphold the court of appeals'

judgment which affirmed the trial court's denial of Appellant's motion to suppress the drug evidence found pursuant to a search warrant.

## I.      Background

One evening shortly before 11 p.m., an automatic sprinkler alarm was triggered at an apartment complex, and the Bedford Fire Department responded to a suspected fire in one of the units. Firefighter Darren Cook arrived to find smoke and water flowing from the front door of Appellant's apartment. Appellant, who was sitting outside in the grass, informed Cook that no one else was inside. Firefighters entered Appellant's home and extinguished a small stovetop fire. They then began efforts to remove smoke from the apartment one room at a time by opening windows and running fans to increase airflow. This work was conducted in the dark with the only light source being the firefighters' headlamps because power to the apartment had been cut off to avoid the risk of electrical hazards.

During the firefighters' ventilation efforts, Cook observed what he believed to be evidence of drugs or drug paraphernalia in plain view, including: (1) a torch, (2) little plastic baggies, (3) an unmarked jar of pills, (4) a glass object with some residue inside it, and (5) numerous lighters and/or butane lighter fluid.[1] He also encountered multiple firearms inside the apartment. In fact, Cook testified at the hearing on Appellant's motion to suppress that while attempting to ventilate the back bedroom in the dark, he knelt on a futon in an effort to open a window and his knee came into contact with a rifle hidden under some blankets.[2] Cook stated that at this point, the firefighters decided to "really slow things down" and call the police for assistance. He testified that the

---

[1] Cook, who had been a firefighter for fifteen years, testified that he had attended numerous classes on how to recognize drug paraphernalia and had ample experience observing paraphernalia when responding to fires, thereby allowing him to recognize the paraphernalia at issue here.

[2] In addition to this rifle, Cook also observed a second rifle and a handgun in the bedroom, as well as a revolver on the kitchen counter and another firearm in the living room on the loveseat.

combination of possible narcotics, multiple unsecured firearms throughout the apartment, and flammable liquids put the firefighters on "high alert" and caused him to be concerned for his safety and the safety of the other firefighters.[3] He further testified that the presence of these potential safety hazards, especially in a dark and smoky environment, hindered the firefighters' ventilation efforts. He noted that some drugs, specifically Fentanyl, can "catch on fire" and become airborne, posing serious health risks to firefighters. Having decided that these safety concerns required assistance from the police because of their expertise in handling drugs and firearms,[4] Cook called the Bedford Police Department.

Officer Hunter Hart arrived shortly after 11:30 p.m. and testified that he was dispatched "to assist the fire department on the structure fire" but "wasn't given any other specific details." Hart initially made contact with the fire battalion chief outside the apartment.[5] The battalion chief told Hart that firefighters had been unable to finish ventilating because of safety concerns and first needed police to perform a safety check of the apartment.[6]

---

[3] At another point in his testimony, Cook indicated that, setting aside the possible risks to firefighters, he had safety concerns resulting from the presence of drug paraphernalia, firearms, ammunition, and flammable liquids and the risk those things might pose to surrounding residents in the apartment building. Cook also noted that the apartment had baby toys and clothing suggesting that a child lived there. He stated that he "would have contacted [Child Protective Services] just for loose firearms and drug paraphernalia around a child," even though no child was present on the night of the fire.

[4] Cook explained that firefighters are not "trained to . . . handle the firearms as much as they [the police] are, so that's not our work." He also testified that it was not the fire department's job to seize evidence of criminal activity, but that if he saw evidence of criminal activity such as drug paraphernalia, it was his job to "notify the police."

[5] Much of the information recited in this opinion regarding Officer Hart's actions and statements is derived from Officer Hart's body-cam video, which was admitted into evidence at the motion to suppress hearing.

[6] Specifically, the battalion chief told Hart, "We can't ventilate [the] back room. . . . The reason is he's got blankets and stuff taped all around the window. . . . The guys [firefighters] came down and told me he's got [ ] guns, bullets, all kinds of drug paraphernalia and everything else in there."

Before entering the apartment, Hart checked to make sure Appellant was unharmed. He did not, however, ask Appellant for consent to enter his apartment.[7] But Hart testified that at the time he entered the apartment, he believed firefighters were still trying to ventilate and needed him to go "inside and [make] sure everything was safe."

Once inside the apartment, Hart conducted what he described as a "protective sweep" to check for threats.[8] During his initial entry, Hart inspected each room, ending with the back bedroom. There, he observed the same items that Firefighter Cook had observed in plain view, including glass pipes or bongs containing residue, a bottle of pills, a plastic baggie containing a white, crystal-like substance, and smaller plastic baggies commonly associated with drug activity.[9] After finishing his "protective sweep," Hart walked outside without seizing anything. He testified that based upon his plain-view discovery of possible drugs and/or paraphernalia, he believed he had the authority to "freeze" the scene.[10]

Outside, Hart spoke with another officer about what he had just observed. He then re-entered the apartment with the other officer, and they were soon joined by at least two more

---

The battalion chief continued, "I don't know what we can do, but that apartment belongs to me until I release it. And I'm having you [Hart] go check it for the safety of my guys."

[7] According to the probable-cause affidavit, following the discovery of the paraphernalia in plain view, another officer asked Appellant for his consent to search the apartment and he refused.

[8] Hart indicated that he was initially looking for any people inside the apartment who might pose a threat to firefighters. He stated that before entering, no one told him whether anyone else was in the apartment who might pose a threat.

[9] This crystal-like substance inside a baggie was in plain view on a dresser. It was not the methamphetamine that was later discovered pursuant to the search warrant which formed the basis for Appellant's prosecution.

[10] Hart testified that freezing the scene meant that, after observing contraband in plain view, "we don't let anybody in or out of that scene who isn't law enforcement or who isn't supposed to be there. And then at that point, someone can make the decision on whether or not we want to apply for a search warrant, which is usually a supervisor who makes that decision."

officers.[11] During the re-entry, Hart opened a box containing ammunition and a sunglasses case. Neither of these actions led to the discovery of the methamphetamine for which Appellant was eventually prosecuted, and no evidence was seized during the re-entry.[12] About twelve minutes after his second entry, Hart left the apartment.

Around midnight, narcotics officers were called to the scene to observe the plain-view evidence to determine whether to seek a search warrant. Around this same time, Appellant, who was still outside, was arrested for possession of drug paraphernalia.[13] Officer Versocki, a narcotics investigator, then prepared a probable-cause affidavit and sought a warrant to search Appellant's apartment for methamphetamine. In the affidavit, he included his own observations of the plain-view evidence, as well as the observations of Firefighter Cook and Officer Hart.[14] At 3:12 a.m., officers secured a warrant to search Appellant's apartment. Upon execution of the search warrant, officers discovered methamphetamine that had not been in plain view. Appellant was charged with possession of methamphetamine between 1 and 4 grams.[15]

Appellant filed a motion to suppress the drug evidence, arguing that the officers' entry into his apartment was a warrantless search that did not fall within any lawful exception to the warrant requirement. He contended that the fire had been fully extinguished and the apartment ventilated

---

[11] Although multiple officers were on the scene, it is unclear from the record or Hart's body-cam video exactly how many officers were present in the apartment. Hart was the only officer to testify at the motion to suppress hearing.

[12] At the hearing, Hart acknowledged that he should have waited until a search warrant was obtained before opening any containers.

[13] The record does not reflect precisely at what time these events occurred, but the probable-cause affidavit indicates that narcotics investigators were called to the scene at midnight, and the search warrant was signed shortly after 3 a.m.

[14] The contents of the probable-cause affidavit are set out in Section D below.

[15] *See* TEX. HEALTH & SAFETY CODE § 481.115(c).

before the officers' arrival, such that any exigency had dissipated. Thus, he asserted, the officers had no lawful basis for entering his apartment and their observations could not properly establish probable cause to support issuance of the search warrant.

The State countered that Hart's entry was justified based on the information he received from the fire battalion chief asking him to secure the scene for the firefighters' safety. Once Hart saw the drug paraphernalia in plain view, the State contended that he then had the authority to freeze the scene and call other officers to assist in the investigation. Alternatively, the State relied on the Supreme Court's decision in *Michigan v. Tyler* to argue that the firefighters' lawful authority to be inside the apartment extended to the police officers. *See* 436 U.S. 499, 509 (1978). Thus, the State's position was that because firefighters were lawfully present in the apartment pursuant to the exigency of the fire, they were permitted to seize any evidence of criminal activity that was in plain view. Extending that principle, the State argued that police officers should be permitted to "step into the shoes" of firefighters and seize or observe that same evidence.

Following the suppression hearing, the trial court denied Appellant's motion to suppress. In its findings of fact, the trial court found the testimony of Cook and Hart reliable and credible. The trial court also made findings that the presence of safety concerns "hindered [the fire department's] ability to do their job;" that Cook called the police department as a result of "his safety concerns and the drug paraphernalia in plain view;" and that Hart "entered the apartment to secure it for the safety of" the firefighters. The trial court concluded, "Firefighter Cook's entry was lawful due to the ongoing exigency of the fire; Officer Hart's entry was also lawful in that he was 'stepping into the shoes' of the firefighter." Following the trial court's ruling, Appellant pleaded guilty to the drug possession charge but retained his right to appeal the denial of his motion to suppress.

On direct appeal, the court of appeals upheld the trial court's ruling. It reasoned that if evidence of criminal activity is discovered by firefighters during the course of a lawful entry under exigent circumstances, firefighters may seize that evidence under the plain-view doctrine. *Martin v. State*, 576 S.W.3d 818, 823-24 (Tex. App.—Fort Worth 2019) (citing *Michigan v. Clifford*, 464 U.S. 287, 294 (1984)). It then extended this reasoning to further conclude that police officers "'may enter premises to seize contraband that was found in plain view by firefighters or other emergency personnel, at least if the exigency is continuing and the emergency personnel are still lawfully present.'" *Id.* at 824 (quoting *State v. Bower*, 21 P.3d 491, 496 (Idaho Ct. App. 2001)). The court reasoned that here, the exigency continued "for a reasonable time to allow firefighters to complete their duties, and it was within this window that Officer Hart conducted his investigation." *Id.* at 825-26. It further determined that Hart did not exceed the scope of the firefighters' legitimate entry. *Id.* at 826. The court of appeals concluded that Officer Hart was permitted to "step into Cook's shoes and make the same plain-view observation that Cook was entitled to make." *Id.* Having held that Officer Hart's entry into the apartment was reasonable under the Fourth Amendment, the court of appeals overruled Appellant's sole issue. *Id.*

We granted Appellant's petition for discretionary review on a single ground to consider whether the court of appeals correctly held that the officers' warrantless entry into Appellant's apartment did not result in a Fourth Amendment violation.[16] Appellant argues that there were

---

[16] Appellant's ground for review states,

> In *Talent v. City of Abilene*, 508 S.W.2d 592 (Tex. 1974), peace officers were distinguished from firefighters, who "(have) no roving commission to detect crime or to enforce the criminal law." Unlike fire marshals, who are peace officers, firefighters do not have general law-enforcement powers. Thus, absent an exigency that allows an officer to enter without a warrant, if a firefighter enters a home to extinguish fires or save lives and notices contraband even in plain view, that firefighter's knowledge does not "impute" to a peace officer, and the officer should be prohibited from entering the home without a warrant.

multiple Fourth Amendment violations. He alleges that Officer Hart's warrantless entry was unlawful because there was no actual exigency to justify Hart's actions. He further argues, as a separate matter, that the subsequent warrantless entries by other officers were also unlawful because, even assuming the existence of an exigency that would justify Hart's entry, any such exigency had dissipated by the time of those additional entries. He makes this distinction because the probable-cause affidavit was prepared by and includes the observations of narcotics investigator Versocki, who entered the apartment after Hart's initial entry with the sole purpose of observing the plain-view evidence to determine whether to seek a search warrant. Thus, Appellant argues that the probable-cause affidavit contains "fruit of the poisonous tree" based on the unlawfulness of both Hart's and Versocki's entries and does not support the issuance of the search warrant.

## II.     Analysis

We agree with the court of appeals' ultimate conclusion upholding the trial court's ruling in this case, but we do so by applying different reasoning. In support of its holding, the court of appeals adopted a rule from other jurisdictions—that when a firefighter observes contraband in plain view during his lawful entry pursuant to exigent circumstances, he may call upon a police officer to enter that dwelling and seize such evidence without a warrant, so long as the exigency is ongoing. The court of appeals applied this rule to these factually-distinct circumstances involving evidence discovered pursuant to a search warrant (as opposed to a seizure of plain-view evidence). It concluded that, because Firefighter Cook was lawfully present in Appellant's apartment, once he observed drug paraphernalia in plain view, he was permitted to call upon Officer Hart to "step into his shoes" and observe that same evidence for purposes of obtaining a warrant to search Appellant's apartment. In its brief on discretionary review, the State asks us to

adopt this rule as a reasonable extension of the exigent circumstances exception to the warrant requirement. We, however, conclude that the instant case should be resolved on narrower grounds.

Here, the record reflects, and the trial court found that Firefighter Cook's primary purpose in calling the Bedford Police Department to the fire scene was to request their assistance with his safety concerns that arose while firefighters worked to ventilate Appellant's apartment. Under these facts, it was reasonable for Officer Hart to have entered Appellant's dwelling pursuant to the exigency of the fire and its immediate aftermath, without the need to first secure a warrant. Upon his entry into the apartment, Hart's discovery of the plain-view evidence shifted his focus from a safety inspection towards a criminal investigation. But this after-the-fact discovery does not undermine the independent safety justification for Hart's initial entry. Therefore, Officer Hart was lawfully permitted to enter Appellant's apartment in response to the firefighters' legitimate safety concerns. Having a lawful justification for being inside Appellant's apartment, any evidence observed by Hart in plain view during that entry could serve as probable cause to seek a search warrant. Given these circumstances, we need not reach the broader issue addressed by the court of appeals of whether an officer may always "step into the shoes" of a firefighter during the course of an exigency to seize or observe contraband that is in plain view.

With respect to Appellant's challenge to the additional entries by other officers, we conclude that we also need not address that matter. Even assuming that the additional entries were unlawful, the search warrant is nevertheless supported by probable cause based on the observations of Cook and Hart as recited in Versocki's affidavit. On this basis, therefore, we uphold the trial court's ruling denying Appellant's motion to suppress the drug evidence that was discovered pursuant to the search warrant.

**A.      Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). "We give almost total deference to the trial court's findings of fact and review *de novo* the application of the law to the facts." *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). "When a trial judge makes express findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). We will uphold the trial court's ruling if it is correct under any applicable theory of law and the record reasonably supports it. *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019).

### B.   Applicable Fourth Amendment Principles

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S CONST. amend. IV. "The text of the Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

With respect to warrantless searches of a residence, the Supreme Court has observed that special protections attach to the home, stating, "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Thus, a warrantless search of a home is presumptively unreasonable. *King*, 563 U.S. at 459. This

presumption, however, "may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Accordingly, even with respect to warrantless searches of the home, "the warrant requirement is subject to certain reasonable exceptions." *Id.*

One well-recognized exception applies when "'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search, including law enforcement's need to . . . enter a burning building to put out a fire and investigate its cause." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (citing *Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978)). However, a warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation[.]'" *Mincey*, 437 U.S at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)); *see also Michigan v. Clifford,* 464 U.S. 287, 294-95 (1984) (plurality op.) (noting that the scope of a search conducted pursuant to exigent circumstances "may be no broader than reasonably necessary to achieve its end"). Given "the fact-specific nature of the reasonableness inquiry . . . we evaluate each case of alleged exigency based on its own facts and circumstances." *McNeely*, 569 U.S. at 150. We apply an objective standard based on the facts known to the officers at the time of the search. *Laney v. State,* 117 S.W.3d 854, 862 (Tex. Crim. App. 2003); *see also State v. Garcia*, 569 S.W.3d 142, 150 (Tex. Crim. App. 2018) ("[B]oth the Supreme Court and this Court have said, time and again, that a Fourth-Amendment reasonableness inquiry should be informed by the facts that were 'available' to the officer when he conducted the contested search.").

Specifically, with respect to the exigency created by a fire, the Supreme Court has stated, "A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or

consent before entering a burning structure to put out the blaze." *Tyler*, 436 U.S. at 509. Further, the exigency justifying a warrantless entry to fight a fire does not end "with the dousing of the last flame;" such a view of the firefighting function is "unrealistically narrow." *Id.* at 510; *see also Clifford,* 464 U.S. at 293 ("The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises."). As such, fire officials need not secure a warrant to remain on the premises of a fire-damaged property for a reasonable period of time to complete their duties. *See Tyler*, 436 U.S. at 510 (holding in suspected arson case involving multiple entries by fire and police officials that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished"). But, where additional entries by officials onto fire-damaged premises are "clearly detached from the initial exigency and warrantless entry," such entries require a warrant or some other exception. *Id.* at 511; *see also Clifford*, 464 U.S. at 293 ("Where [ ] reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been extinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the identification of some new exigency.").

**C.**     **Officer Hart's initial entry was justified by the exigency of the fire and its immediate aftermath.**

In the instant case, Appellant acknowledges that firefighters were lawfully permitted to enter his apartment without a warrant pursuant to the exigency of the fire. *See Tyler*, 436 U.S. at 509. He further concedes that firefighters were permitted to remain on the scene after the blaze was extinguished and enter his bedroom in an attempt to ventilate the apartment. *Id.* at 510.[17]

---

[17] *See also Jones v. Comm.,* 512 S.E.2d 165, 168 (Va. Ct. App. 1999) (Firefighter "not only had the right to enter appellant's apartment without a warrant, he also had the duty to ventilate the apartment by opening its windows and to search for people or pets that might be inside."); *State v. Bell*, 737 P.2d 254, 257 (Wash. 1987) ("Firefighters need no warrant to remain in the building a reasonable time to make sure that the fire does not rekindle, to search for additional fires, and to ventilate the building.").

Appellant even admits that, because Firefighter Cook was lawfully present in the apartment, he was authorized to observe the paraphernalia found in plain view.[18]

The real question is whether the exigency of the fire also justifies Officer Hart's warrantless entry. We conclude that under these circumstances, it does. In reaching this conclusion, we are guided by the Supreme Court's opinion in *Tyler*. *Tyler* is distinguishable in some respects,[19] but the salient point of that case applies here: where fire or police officials enter a structure during or in the immediate aftermath of a fire to conduct legitimate duties connected to the original exigency of the fire, no search warrant is required. *See id.* at 510-11. Applying that principle here, Officer Hart's warrantless entry into Appellant's apartment was lawfully permitted. According to the trial court's findings of fact, which are supported by the record: (1) Officer Hart was dispatched to assist the fire department with a structure fire; (2) the fire battalion chief informed Hart of the various safety concerns that had arisen while firefighters were still working on the scene and asked

---

[18] Appellant does not concede, as the State urges, that Firefighter Cook was permitted to seize the paraphernalia found in plain view. In any event, because this case does not involve a challenge to the plain-view seizure of the paraphernalia but instead involves a seizure of drugs discovered pursuant to a search warrant, we need not further consider whether Firefighter Cook would have been authorized to seize the drug paraphernalia.

[19] In *Tyler*, the Supreme Court considered the lawfulness of multiple warrantless entries by fire and police officials into a burned-out furniture store during the aftermath of the fire to investigate its cause. *Tyler*, 436 U.S. at 501-03. During those entries, officials seized various items of evidence that had been found in plain view. *Id.* In upholding the lawfulness of the entries and related seizures that occurred in the immediate aftermath of the fire, the Court reasoned that the "firefighting function" is broad enough to encompass more than just the dousing of flames and may include additional tasks, conducted within a "reasonable time" after the blaze is extinguished, such as preventing the fire's recurrence and the prevention of intentional or accidental destruction of evidence. *Id.* at 509-10. The Court further upheld a warrantless re-entry by investigators several hours after firemen had left the scene, reasoning that such entries were "no more than an actual continuation of the first[.]" *Id.* at 511. But the Court rejected the lawfulness of warrantless entries by a detective several weeks after the fire that were solely for investigatory purposes, noting that such entries were "clearly detached from the initial exigency and warrantless entry." *Id.* Thus, while *Tyler* is distinguishable in some respects, the Supreme Court made clear that no warrant is needed when fire or police officials enter a structure during or in the immediate aftermath of a fire to conduct legitimate duties related to the original exigency of the fire. *See id.* at 510-11.

Hart to conduct a safety check; and (3) based on the facts known to him at the time, Hart reasonably believed that the safety check was necessary to allow the firefighters to complete their ventilation efforts. Given these facts, it was objectively reasonable for Hart to enter the apartment to conduct the requested safety check without first securing a search warrant.

In conducting the safety inspection, Hart functioned initially in his role of providing support to the fire-response team. *See id.* at 509-10; *see also Laney,* 117 S.W.3d at 861 (stating, in the related context of the emergency doctrine, that a warrantless entry into a residence may be reasonable where "the police are acting, not in their 'crime-fighting' role, but in their limited community caretaking role to 'protect or preserve life or avoid serious injury'") (quoting *Mincey*, 437 U.S. at 392). Once inside, while conducting a safety sweep, Hart observed the plain-view drug paraphernalia. Hart's primary role then shifted from ensuring firefighter safety to an investigatory role. This change in roles, however, does not negate the safety-related justification for the initial entry.[20] Further, with the exception of the opening of the sunglasses case and ammunition container

---

[20] Appellant claims that Officer Hart's entry was based on pretext and was actually for investigative purposes rather than for firefighter safety. In making this assertion, Appellant effectively contends that there was no actual exigency that would justify Hart's warrantless entry. With respect to this contention, we make two observations. First, the trial court found Cook and Hart credible in stating that the purpose for Hart's entry was to assist the firefighters by conducting a safety check so that they could resume ventilation efforts. We defer to the trial court's credibility findings that are supported by the record, as they are here. *Ruiz*, 577 S.W.3d at 545. Second, even assuming for the sake of argument that Hart's actual purpose in entering Appellant's dwelling was to investigate possible criminal activity, his subjective motivations are not dispositive. So long as the record contains *objective* facts to establish that an exigency existed such that the warrantless entry was justified, the Fourth Amendment is not violated, regardless of an officer's subjective motivations. *State v. Garcia,* 569 S.W.3d 142, 151 (Tex. Crim. App. 2018) (stating that officer's subjective motivations are "irrelevant" for Fourth Amendment purposes; proper inquiry is whether "the known facts objectively support the existence of an exigency;" the question is "one of objective reasonableness, not subjective processes of thought"). Here, given that firefighters were still actively working the scene at the time of Hart's arrival and had encountered unsecured firearms and drug paraphernalia that hindered their efforts, the objective facts support the existence of exigent circumstances to justify Hart's entry. Along these same lines, contrary to Appellant's implicit suggestion, it does not matter that the firefighters' safety concerns ultimately proved, in hindsight, to be less significant than Hart may have originally believed because we must judge his conduct based on the objective facts known to him at the time. *Id.*; *see also id.* at 158 ("Assessing

which produced no probable-cause evidence, Hart did not exceed the scope of the firefighters' license to be present in Appellant's bedroom and observe the objects found in plain view. Thus, his presence was "circumscribed by the exigencies" justifying the entry. *Mincey*, 437 U.S. at 393.[21]

In sum, we agree with the court of appeals' ultimate conclusion that Officer Hart had a lawful basis for entering Appellant's dwelling. Officer Hart entered the apartment in response to the firefighters' legitimate safety concerns that arose in the immediate aftermath of the fire. The objective facts known to him at the time supported his reasonable belief that such safety check was necessary for firefighters to complete the unfinished ventilation efforts. We, therefore, uphold that aspect of the court of appeals' analysis.

### D. The observations of Hart and Cook were adequate to establish probable cause, such that we need not consider lawfulness of additional entries.

In addition to challenging Officer Hart's initial warrantless entry, Appellant also challenges the entry of officers after Hart. Specifically, Appellant challenges the warrantless entry of narcotics Investigator Versocki, who prepared the probable-cause affidavit and included his own observations. In his petition for discretionary review, Appellant contends that even assuming Hart's initial entry was lawful, these additional entries constitute warrantless searches for which no lawful justification exists, given that the exigency of the fire had dissipated by the time of the subsequent entries. Therefore, he suggests, any observations made during those subsequent entries must be excised from the probable-cause affidavit, without which the affidavit fails to establish probable cause. As we explain further below, we conclude that we need not address whether the

---

police conduct with the advantage of hindsight is inconsistent with the Fourth Amendment's idea of 'reasonableness.'"). Therefore, we reject Appellant's contention that the facts fail to establish the existence of actual exigent circumstances that would justify Hart's warrantless entry.

[21] As noted above, Hart acknowledged in his testimony at the motion to suppress hearing that it was improper to open the containers prior to obtaining a search warrant. No evidence was discovered during this conduct, and therefore this fact does not undermine the validity of Hart's plain-view observations.

additional entries were unlawful because, even excising Investigator Versocki's observations from the affidavit, the search warrant was nevertheless adequately supported by probable cause based on the remaining information in the affidavit.[22]

### 1. Applicable Law For Evaluating Residual Probable Cause

Probable cause to support the issuance of a search warrant exists "where the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued." *Davis v. State,* 202 S.W.3d 149, 154 (Tex. Crim. App. 2006). The test is not whether the warrant affidavit demonstrates by a preponderance of the evidence that a search of the listed location would yield a particular item of evidence; "a 'fair probability' will suffice." *Foreman v. State*, 613 S.W.3d 160, 163 (Tex. Crim. App. 2020) (quoting *Illinois v. Gates,* 462 U.S. 213, 235 (1983)). A search-warrant affidavit must be read in a common sense and realistic manner, without demanding hyper-technical exactitude. *Davis*, 202 S.W.3d at 154; *Foreman*, 613 S.W.3d at 163-64; *see also State v. Cuong Phu Le,* 463 S.W.3d 872, 878 (Tex. Crim. App. 2015) (stating that probable cause must be assessed under the totality of the circumstances and is a "flexible, non-demanding standard"). While a magistrate may not baselessly presume facts that the affidavit does not support, reasonable inferences may be drawn from the facts and circumstances contained within the four corners of the affidavit. *Foreman*, 613 S.W.3d at 164; *Davis,* 202 S.W.3d at 154.

---

[22] We note that this issue was not addressed by the court of appeals. Rather, the court of appeals limited its analysis to addressing only the lawfulness of Hart's initial entry. *See Martin,* 576 S.W.3d at 826 (concluding that "Officer Hart's entry into the apartment was lawful under the Fourth Amendment"). Although there is no analysis from the court of appeals for us to review on this question, we nevertheless conclude that resolution of this issue is sufficiently straightforward such that we may address it for the first time on discretionary review in the name of judicial economy. *See McClintock v. State,* 444 S.W.3d 15, 20 (Tex. Crim. App. 2014) (observing that "'when the proper disposition of an outstanding issue is clear, we will sometimes dispose of it on discretionary review in the name of judicial economy'" rather than remanding to the court of appeals) (quoting *Gilley v. State*, 418 S.W.3d 114, 119 (Tex. Crim. App. 2014)).

Where a probable-cause affidavit is determined to contain illegally-obtained information, the proper course is to excise the tainted information and examine whether the remaining information still establishes probable cause. *See McClintock v. State,* 444 S.W.3d 15, 19 (Tex. Crim. App. 2014) ("When part of a warrant affidavit must be excluded from the calculus . . . then it is up to the reviewing courts to determine whether 'the independently acquired and lawful information stated in the affidavit nevertheless clearly established probable cause.'") (quoting *Castillo v. State*, 818 S.W.2d 803, 805 (Tex. Crim. App. 1991)); *Le,* 463 S.W.3d at 877 ("A search warrant based in part on tainted information is nonetheless valid if it clearly could have been issued on the basis of the untainted information in the affidavit."). In our recent decision in *Hyland v. State*, we explained that our use of the word "clearly" in this context did not establish a heightened probable-cause standard; rather, the ordinary standard still applies. 574 S.W.3d 904, 913 (Tex. Crim. App. 2019). But, in *Hyland*, we also acknowledged that the deference reviewing courts ordinarily owe to a magistrate's conclusion regarding the adequacy of a warrant affidavit "'is not called for when the question becomes whether an affidavit, stricken of its tainted information, meets the standard of probable cause.'" *Id.* (quoting *Le*, 463 S.W.3d at 877). Thus, under these circumstances, we conduct a non-deferential review to evaluate whether, after excising the allegedly tainted observations from the affidavit, the remaining facts nevertheless give rise to a fair probability that evidence of criminal activity would be found at a specified location. *Le*, 463 S.W.3d at 878.

### 2. The Affidavit

We now examine the probable-cause affidavit prepared by narcotics investigator Versocki. After specifying the type of evidence sought (methamphetamine and items related to

methamphetamine trafficking)[23] and identifying and describing the location to be searched (Appellant's apartment), the affidavit put forth the following facts to establish probable cause:

A. That your Affiant, Investigator A. Versocki #997, is a peace officer in the State of Texas and is currently employed as a police officer with the City of Bedford, Tarrant County, Texas. Your Affiant has been employed as a police officer for over ten years. Your Affiant is currently assigned to the Criminal Investigation Division (CID) as a narcotics investigator. Your Affiant has attended several classes on narcotic identification and investigations, and has been involved in numerous narcotic investigations involving the possession and trafficking of narcotics.

B. That on August 30, 2017 at 2359 hours approximately hours [sic] your Affiant and Inv. Bridger were contacted by Bedford Police Department Cpl. W. Mack # 873 who advised that patrol officers had been dispatched to 1009 Amherst Dr. #2014, Bedford, Tarrant County, Texas, 76021 in reference to a structure fire. Cpl. Mack stated that they had responded to assist Bedford Fire Department on a structure fire after firefighters made entry and located what they believed to be drug paraphernalia along with multiple firearms and ammunition. Officer Hart #1122 arrived on scene first and made entry and observed plastic deal baggies containing a white crystallized residue along with a glass jar containing a variety of different prescription pills.

C. That your Affiant arrived on scene and made contact with Cpl. Mack. Cpl. Mack advised that the apartment belonged to Casey Martin and that he was currently sitting outside near the parking lot. I observed a white male wearing no shirt with visible tattoos on his chest sitting on the step in front of the apartment building. I made entry into the apartment and observed fire damage that appeared to be concentrated in the kitchen area. I also observed that the fire suppression system had been activated in the apartment and a large amount of water had flooded the kitchen and living room area. Cpl. Mack advised that Casey said he had been cooking chicken nuggets.

---

[23] Specifically, the affidavit stated, "Warrant to search a particular place for a particular controlled substance, namely METHAMPHETAMINE, and seize evidence, books, records, ledgers, bank records, money orders, and computer files relating to the transportation, ordering, sale and distribution of METHAMPHETAMINE and/or records relating to the receipt and/or disposition of proceeds from the distribution of METHAMPHETAMINE, currency, financial instruments, jewelry, and/or other items of value and/or proceeds of drug transactions as evidence of financial transactions relating to obtaining, transferring, laundering, secreting, or spending large sums of money made from engaging in METHAMPHETAMINE distribution activities; cell phones, pagers, and other similar electronic equipment; telephone and address books, computer files or papers reflecting names, addresses, and/or telephone numbers of individuals associated in dealing METHAMPHETAMINE; photographs of individuals, property, currency, and METHAMPHETAMINE, including video recordings, materials used in the packaging, cutting, weighing, and distributing METHAMPHETAMINE and firearms and electronic surveillance equipment believed concealed in a particular place.

D. That your Affiant was led into the southeast bedroom by Cpl. Mack and I observed a clear plastic baggy with a white crystal like substance that is consistent in texture to what I know to be crystal methamphetamine sitting on a dresser in plain view. Also on the dresser in plain view, I observed a clear glass jar containing what appeared to be several prescription medications. I observed a large glass smoking pipe containing burnt Tetrahydrocannabinol/marijuana residue located on a shelf in the closet that had the door standing open. In plain view on a night stand in a plastic bin I observed a broken bulbous pipe with brown residue inside. The pipe is consistent with the type of pipe used to smoke methamphetamine and the brown residue is consistent with burnt methamphetamine residue.

E. That Cpl. Mack and Officer T. Noble #968 asked Casey Martin for consent to search his apartment which he denied.

F. That Inv. Bridger #1032 spoke to Bedford Firefighter D. Cook #117 by phone. Firefighter Cook advised that as he pulled into the complex on the firetruck he observed a white male thin build short hair with tattoos on his chest area that was exposed. The male subject was wearing shorts with a towel draped over him. He advised that he asked the male subject if he lived in apartment #2014 and the male subject stated that he did. Cook advised that when they were inside the apartment using fans to ventilate the apartment in several areas he observed multiple firearms and ammunition along with what he believed to be drug paraphernalia. Firefighter Cook asked the male subject what happened and Mr. Martin advised that he was cooking and fell asleep. He further stated that he lives there with his wife and daughter but that they are currently in Arkansas.

G. That 1009 Amherst Dr. #2014 Bedford, Tarrant County, Texas 76021 at this time [is] secured by officers of the Bedford Police Department until a search warrant can be obtained.

H. That your Affiant believes that Casey Martin white/male 01/17/1991 is in possession of methamphetamine from within the residence located at 1009 Amherst Dr. #2014, Bedford, Tarrant County, Texas, 76021 and that more methamphetamine is being kept and stored from there.

**3.  After excising the challenged portions, the affidavit still establishes probable cause.**

Even after excising all of Investigator Versocki's direct observations from inside the apartment, the remaining information in the affidavit establishes the following:

- That Investigator Versocki is a peace officer with more than ten years' experience and specialized training in the investigation of narcotics offenses;

- That, upon entry into Appellant's apartment, firefighters located "what they believed to be drug paraphernalia along with multiple firearms and ammunition;"

- That Officer Hart made entry and "observed plastic deal baggies containing a white crystallized residue along with a glass jar containing a variety of different prescription pills;"

- That based on these facts, Investigator Versocki believed Appellant was in possession of methamphetamine.

These facts, standing on their own, are sufficient to establish probable cause that drugs would be found in Appellant's apartment. A magistrate here would be justified in inferring that both Firefighter Cook and Officer Hart are credible and have some experience in recognizing drug paraphernalia and signs of drug activity.[24] Given their respective roles as fire and police officials, rather than laypersons, it is reasonable to presume that they have seen such items before and know how to distinguish between innocent behavior and criminal drug activity. Thus, a magistrate would be justified in concluding that Appellant did in fact possess paraphernalia, deal baggies with residue, and a jar of prescription pills inside his bedroom.

A magistrate would also be justified in inferring that Investigator Versocki, upon learning of the observations of Cook and Hart, applied his own expertise as a narcotics investigator to draw the additional conclusion that drug activity was likely afoot. Although any of the items in isolation—unidentified paraphernalia, deal baggies with residue, pills, firearms, or ammunition— may not indicate drug activity, it would be reasonable for Investigator Versocki to view these items collectively and conclude that probable cause existed to believe that drugs were being concealed

---

[24] As noted above, Cook testified at the suppression hearing that he had attended numerous classes on how to recognize drug paraphernalia and had observed paraphernalia on many previous occasions while responding to fire scenes. The magistrate, however, was not privy to that information because it was not contained in the probable-cause affidavit. Just as the magistrate can look only to the four corners of the probable-cause affidavit in making his initial assessment of probable cause, we are also limited to the four corners of the affidavit in determining whether the remaining facts establish probable cause here. *See Hyland,* 574 S.W.3d at 907 n.4 (probable cause analysis is "confined only to the information contained within the four corners of the search warrant affidavit"). Therefore, we do not consider Cook's testimony from the suppression hearing regarding his expertise in our analysis. *See Massey v. State,* 933 S.W.2d 141, 148 (Tex. Crim. App. 1996) ("[W]e look at the four corners of the affidavit in determining the existence of probable cause to search the identified locations. Statements made during the pretrial hearing do not factor into that determination.") (citations omitted).

in the apartment. A magistrate would further be justified in crediting Versocki's expertise in this assessment. In sum, we conclude that: (1) the direct observations by Firefighter Cook and Officer Hart; (2) their respective opinions based on those observations that Appellant was in possession of drug paraphernalia, deal baggies, pills and firearms; and (3) the expert opinion of Versocki opining that those items were suggestive of drug activity, were sufficient to justify the conclusion that drugs would probably be found in Appellant's apartment. Therefore, in view of the totality of the circumstances, and applying the flexible and non-demanding standard that governs our inquiry here, the information in the affidavit, purged of any allegedly tainted information, is adequate to support probable cause. Accordingly, we need not consider Appellant's contention that Investigator Versocki unlawfully entered Appellant's apartment and that Versocki's observations cannot properly support issuance of the search warrant.

### III.    Conclusion

We agree with the court of appeals' conclusion that Officer Hart had a lawful basis for entering Appellant's apartment without a search warrant. But because we hold that Officer Hart's conduct was justified in response to the firefighters' legitimate safety concerns pursuant to the exigency of the fire and its immediate aftermath, we need not address the court of appeals' broader bright-line rule that would always permit an officer to "step into the shoes" of a firefighter and seize plain-view contraband. We also conclude that the information in the search-warrant affidavit, after excising the observations of Investigator Versocki, was adequate to establish probable cause, such that we need not consider the lawfulness of the additional entries by other officers after Officer Hart. Accordingly, we affirm the judgment of the court of appeals upholding the trial court's ruling denying Appellant's motion to suppress.

Delivered: April 14, 2021

Publish