# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00742-CR

**The State of Texas, Appellant**

**v.**

**Brandon James Cielencki, Appellee**

---

**FROM THE 433RD DISTRICT COURT OF COMAL COUNTY**
**NO. CR2017-097, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING**

---

## O P I N I O N

This is an interlocutory appeal brought by the State challenging the trial court's order suppressing evidence. Appellee Brandon James Cielencki was charged by indictment with aggravated sexual assault of a child younger than six years of age. *See* Tex. Penal Code § 22.021. The trial court granted Cielencki's motion to suppress written and oral statements made to investigators during a recorded interrogation following a polygraph exam. The trial court found that the statements were either obtained by actions that violated State law or they were involuntary. Because we conclude that the trial court did not abuse its discretion when it found that Cielencki's statements were not voluntary, we affirm the trial court's order granting defendant's motion to suppress.

**BACKGROUND**

The indictment alleges that Cielencki intentionally and knowingly caused his penis to either penetrate or come in contact with his stepdaughter's[1] mouth when she was younger than six years old. About two weeks after the outcry, which occurred about two years after the alleged offense, Cielencki voluntarily attended a polygraph exam with Special Agent Tim Upright with the Department of Public Safety (DPS). The exam and interrogation that immediately followed lasted nearly eight hours. The polygraph exam took approximately two hours, including introductions, instructions, *Miranda* warnings, a short break, and the exam. Cielencki was informed at the conclusion of the exam that he had failed the polygraph exam.

Agent Upright then began to ask Cielencki to give him "a rational explanation" for why he failed the polygraph. Agent Upright explained that polygraphs work by detecting memories stuck in the amygdala in the brain that a person might interpret as just "intuition." Agent Upright suggested that Cielencki could have failed the test if the victim had touched, played with, or bit his penis while he was sleeping and that the polygraph was detecting that event even though Cielencki did not remember. Agent Upright also suggested that maybe Cielencki's stepdaughter had seen Cielencki naked when he exited the shower. Agent Upright opined repeatedly throughout the interrogation that "accidents," "mistakes," and "this kind of thing" happen all the time with children and that adults do not register it or do not remember it because they have context for the situation, address it in the moment, and move on, but children have no context and will remember things adults do not. Agent Upright told Cielencki that he knew "it" happened and that it was just a matter of Cielencki remembering. About three and a half hours after Cielencki arrived, Agent

---

[1] Because Cielencki's stepdaughter is a minor, we will refer to her by her relationship to Cielencki rather than by name to protect her privacy. *See* Tex. R. App. P. 9.10(a)(3).

Upright suggested bringing in Comal County Sheriff's Office Detective Danny Dufur to assist them in figuring out what happened. Both interviewers continued to express their desire to help Cielencki remember.

For the first six and a half hours, Cielencki maintained that there was never a time that his stepdaughter's mouth was near or on his penis. However, he stated that his stepdaughter was not known for lying and that he wanted to figure out what happened. Throughout the interview, he expressed confusion about why he could not remember what happened or even "picture it" happening. He stated multiple times that he was trying to remember because something must have happened "based on the facts." He explained that "the facts" were his stepdaughter's outcry, the failed polygraph exam, and Agent Upright's expertise in how polygraphs work. He further explained that his understanding of how polygraphs work, based on Agent Upright's explanations, was that his "body [was] telling a computer it happened," even though he could not remember. Shortly before starting to remember the incident, Cielencki stated that he did not want to leave until he had answers.

About five and a half hours after Cielencki had arrived, the interviewers told Cielencki their theory that the alleged offense occurred during the time that Cielencki was on pain medication after having surgery. Cielencki initially asserted that he still would have remembered and that his wife was always with him during that time. Upright told Cielencki that opioids work by "distorting reality" and make people "do stupid stuff." The interviewers told him that his stepdaughter remembered, but that he did not because of the drugs, but that the polygraph test was picking up on his brain telling his body that "it happened."

At the interviewers' prompting, Cielencki attempted to think of any situation in which this could have happened. Cielencki came up with three times he can remember that it was

3

possible his stepdaughter could have accidentally seen him naked. One circumstance was a time when he was showering by himself after surgery with one arm in a sling, and when he opened the bathroom door, he saw his stepdaughter on the bed and then closed the door and got dressed. Through a series of questions about what Cielencki normally did after a shower, Cielencki agreed that he did not normally take his clothes into the bathroom with him when he showered. Based on that answer, the interviewers suggested that he did not close the door and instead had his stepdaughter help him put on his shorts because his arm was in a sling, and it was the first time he was taking a shower without his wife's help. Cielencki agreed but explained that he could not picture anything sexual happening. Agent Upright suggested multiple times that while Cielencki was having his stepdaughter help him with his shorts, that she touched his penis, and that he said, "touch it, put it in your mouth" because he was high on drugs. Agent Upright also suggested that was the first time Cielencki was showering without his wife and that it had probably been a while since he had sex with his wife because of his injury. Agent Upright told Cielencki that when on prescription pain killers, the drugs treat "hungry, tired, and horny" all the same way and told him that his brain would have been trying to meet a need without him fully understanding the situation.

In response to Cielencki explaining that this did not make sense to him based on how his memories usually work, Agent Upright told Cielencki that he could see Cielencki's brain recalling the incident. The interviewers led Cielencki step by step through the story again, but this time Cielencki admitted that he had his stepdaughter help him put on his shorts, adding that they were blue shorts, which he agreed must have happened because he did not usually take his clothes into the bathroom. When he said the story ended there, Detective Dufur told him that could not be all and that Cielencki was not admitting to himself what happened. Cielencki repeated his confusion about why the polygraph was saying that he did something, but he had "no recollection,

4

no images" of it happening. Agent Upright responded that "it was the drugs." Cielencki expressed that he was trying to picture it or to "make it happen" in his mind but was unable to.

Agent Upright told Cielencki that his stepdaughter had his penis in her mouth and that he was looking at the top of her head and then asked him how he had her stop doing that. After a long pause, Cielencki said, "I stopped her . . . I walked away." When asked if she put his penis in her mouth on her own or at his direction, he responded, "I had to have told her. She wouldn't have just done it." He said he remembered her saying "it was too big." He then said he could not remember her putting her mouth on him though. When asked if he became erect or started erect, he stated that he was already erect because he was masturbating in the shower. When asked if the "too big" comment was referencing his erect penis he responded, "it had to be." Cielencki stated that this was the first time he had ever thought about that incident and that "it didn't even dawn on" him when the allegations were first brought up to him. When asked how he felt, he responded that he wanted to kill himself.

Cielencki was left alone to "remember" what happened. About five minutes later the interviewers returned and Cielencki told them the story of what happened. He told them that he had taken a shower to masturbate. He said he did not "finish," but did not remember why. He said when he left the bathroom, his stepdaughter was on the bed in the master bedroom, and he asked her to help him put on his shorts. He said that she touched his penis and then he said, "lick it." He continued his story, stating that his stepdaughter told him, "It's too big," and then he told her to stop, which she did, and then he left the room. After completing his story, Agent Upright asked him, "Then you went to sleep?" Cielencki responded, "Must of."

Agent Upright asked Cielencki why he had never thought about this incident before. Cielencki responded, "The lie detector proved it." He was then left alone again to write out his

5

confession, which he signed after the interviewers came back. After signing the confession, Cielencki asked, "Why do I not remember?" After the interviewers confirmed with Cielencki that he did not intend to harm himself, the interviewers told Cielencki that he was not being arrested at that time and that he would get a phone call letting him know if an arrest warrant was issued.

Cielencki was arrested approximately one month after the polygraph exam and interrogation. He was charged by indictment about three months after his arrest.

Cielencki filed a motion to suppress, and the trial court held a hearing, which spanned over multiple days due in part to the amount of evidence presented. Cielencki presented three legal theories in support of his suppression motion: (1) that the polygraph results were a fraudulent document that were relied on to obtain his confession, *see* Tex. Code Crim. Proc. art. 38.23; Tex. Penal Code § 37.09; (2) that his confession was not voluntary under federal law and that he did not receive proper *Miranda* warnings[2]; and (3) that his confession was not voluntary under State law.

At the hearing the parties offered jointly, and the trial court admitted, the video recording of the eight-hour polygraph exam and interrogation in its entirety. The video includes audio and Cielencki and both interviewers can be heard throughout. However, only Cielencki is seen on the video and the two interviewers are off screen.

The defense called Agent Upright as a witness at the suppression hearing. He testified regarding his understanding of the requirement that a confession must be voluntary, the procedures for handling polygraph results after administering a test, and his techniques—including his use of the polygraph results—that he used throughout the interrogation.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 471 (1966).

The State offered, and the trial court admitted, a recording of a voicemail that Cielencki left for Detective Dufur the day after the polygraph exam and interrogation in which Cielencki called to update Agent Dufur and let him know that Cielencki had told his wife and father about the results of the polygraph exam.

After hearing all of the evidence, including watching the entire polygraph exam and interrogation video, the trial court granted Cielencki's motion to suppress the contents of the video and all "interviewing, testing, by polygraph or otherwise, interrogation and statements, oral and written, of the Defendant following and arising out of" the recorded exam and interrogation. The trial court entered findings of fact and conclusions of law, which covered the trial court's "three independent grounds for suppression of Defendant's statements." The State appealed.

**STANDARD OF REVIEW AND GOVERNING LAW**

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply a bifurcated standard, *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021), in which they give almost total deference to the trial court's findings of fact and review de novo the application of the law to the facts, *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). However, the same deference that is given to factual determinations is "afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if

7

resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). Further, that same deferential standard applies to the trial court's determination of historical facts, even if that determination is based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013); *see State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018) (noting that on matters of historical fact, trial judge is in better position than appellate court to settle disputes). "When, as in this case, the trial court makes findings of fact, we determine whether the evidence, when viewed in the light most favorable to the court's ruling, supports those findings." *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

## DISCUSSION

One of the three legal theories in support of suppressing the evidence that was relied on by the trial court in its findings of fact and conclusions of law was that Cielencki's "statements must be suppressed because they were not freely and voluntarily made but were produced by compulsion or persuasion of the interrogators in violation of [Article] 38.21 of the Texas Code of Criminal Procedure." *See* Tex. Code Crim. Proc. art. 38.21 (providing that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion"). On appeal, the State contends the confession was voluntary and that the trial court erred when it suppressed the confession.

8

Voluntariness must be determined by considering the totality of the circumstances under which the statement was obtained. *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997). There are several different theories under which a defendant may raise a claim that his statement must be excluded because it was involuntary. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). One available theory is "general voluntariness" under Section 6 of Article 38.22 of the Texas Code of Criminal Procedure. *Id.*; *see also* Tex. Code Crim. Proc. art. 38.22 § 6 (providing that "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions"). General voluntariness under "Section 6 of Article 38.22 applies to both an accused's custodial and non-custodial statements because it provides that only 'voluntary' statements may be admitted." *Oursbourn*, 259 S.W.3d at 171.

"Claims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching." *Id.* at 172. A confession must be free and voluntary; it must not be extracted by any sort of threat or violence, obtained by any direct or implied promises, however slight, or acquired by the exertion of any improper influence. *Roberts v. State*, 545 S.W.2d 157, 160-61 (Tex. Crim. App. 1977). A statement is not voluntary if there is "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). When reviewing a general voluntariness issue, we may also consider "inquiries into the state of mind" of the defendant that can render a confession involuntary, such as "[a] confession given under the duress of hallucinations, illness, medications, or even a private threat." *Oursbourn,* 259 S.W.3d at 172. Section 6 of Article 38.22 "may also be construed as protecting people from themselves." *Id.*

The trial court concluded that "[g]iven the totality of the circumstances here, Mr. Cielencki's oral and written statements were not voluntary." The trial court's findings of fact on voluntariness focused on the length of the interview; Agent Upright and Detective Dufur's interrogation techniques, and Cielencki's behavior and mental state throughout the interview. Specifically, the trial court highlighted Agent Upright's insistence on his expertise in polygraphs, the "infallibility of the polygraph," "his views on brain anatomy and function," and his explanation that the polygraph had the ability to know Cielencki was lying "whether he remembered it or not." Regarding Cielencki's mindset, the trial court found that he repeatedly stated that he had no memory of committing the offense until his "responses progress[ed] from denials to capitulation, reflecting a lack of voluntariness." The trial court found that Cielencki was "confused" about the failed polygraph results. The trial court quoted the section of the video in which Cielencki states that the reason he could not previously remember was because "the lie detector test proved it," and the portion in which Cielencki asked after confessing, "Why do I not remember it?" The trial court also found that Cielencki's statements were "the product of fear, intimidation," and "coercion," which "removed any possibility of voluntariness."

As an initial matter, the State contends that the video recording does not rely on an evaluation of credibility and demeanor, and thus, it contends that we should not defer to the trial court's findings but instead solely apply a de novo review based on our review of the video. The State relies on a "narrow" exception to giving deference to historical facts that the Court of Criminal Appeals has applied in "unique circumstances" when there is "indisputable visual evidence" that does not rely on credibility or demeanor evaluations. *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (declining to give deference to trial court finding that defendant gave consent by his words and physical gestures to search his person based on officer's

10

testimony when video and audio evidence indisputably controverted the testimony and instead showed absence of any words or gestures giving consent to search). In this case, however, there was additional evidence, particularly the testimony of the agent, involving credibility determinations. Further, the video recording was only of Cielencki and not the officers. In this context, unlike the video evidence in *Carmouche*, the deciding issue here is not whether or not a specific word was spoken, or gesture was made, but rather what was Cielencki's "state of mind" and was he under some kind of duress that rendered his confession involuntary. *See Oursbourn,* 259 S.W.3d at 172. We conclude that based on this specific recorded video evidence that to determine his state of mind and whether his confession was voluntary requires credibility and demeanor determinations. Specifically, the trial court's findings focused on Cielencki's repeated statements that he had no memory of committing the offense, that he eventually admitted to the offense because he believed the polygraph proved something he could not remember, and that his confusion about his lack of memory of the offense continued even after confessing.[3] Whether these statements were true require a credibility determination. Thus, we will apply the bifurcated standard of review as described above. Specifically, we will give deference to the trial court's findings of facts and application of facts to law and mixed questions of facts that depend on credibility and demeanor determinations. *See Crain*, 315 S.W.3d at 48.

---

[3] The trial court found:

> 33. Mr. Cielencki finally relents and his comments reflect the result of persuasion, compulsion and lack of voluntariness when he again says that he does not remember anything about it and that his admission is based on the lie detector "proving" he did something he cannot remember . . . .

> 34. After writing a statement Mr. Cielencki still questions: "Why do I not remember it?"

The State contends that the video demonstrates that Cielencki's confession was voluntary and freely given. The State interprets the evidence as supporting a determination that Cielencki took advantage of the interviewers' suggestions about repressed memories to fake that he was remembering the offense in the moment in order to cover up his earlier lie that he did not commit the offense. The State also interprets Cielencki's call to Detective Dufur the day after the interrogation as evidence that his confession was voluntary.

However, the trial court's findings about the voluntariness of the confession make clear that the trial court found credible Cielencki's statements made during the interrogation about his confusion and memory. The recorded interrogation supports the trial court's findings of facts and application of those facts to whether the confession was voluntary. Notably, the majority of the details in Cielencki's confession were first suggested to Cielencki by one of the interviewers, including that it happened after he got out the shower, that it happened when he was medicated, that the offense would have been a normal thing for him to do on medication, that he did not bring his clothes with him into the bathroom, that he had his stepdaughter help him with his shorts because his arm was in a sling, and that when she touched his penis when helping him put on his shorts he told her to put her mouth on his penis under the influence of medication before realizing what was happening and stopping her. Although, Cielencki included additional details in his confession that were not first provided by the interviewers, including the color of his shorts and his stepdaughter saying, "It's too big," those details do not render the trial court's credibility and voluntariness determinations unreasonable. *See Duran*, 396 S.W.3d at 570 (applying deferential standard to trial court's determination of historical facts, even when based on video recording admitted into evidence).

12

The State also contends that the trial court's reliance on the deceptive nature of the interviewers' explanation of the capabilities and reliability of polygraph exams was in error. "Misrepresentations made by the police to a suspect during an interrogation is a relevant factor in assessing whether the suspect's confession was voluntary, but it is insufficient to render an otherwise voluntary confession inadmissible." *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996). When considering whether police overreach rendered a confession involuntary, "it is well established that lying about the state of the evidence is not the sort of 'overreaching' that implicates the Due Process Clause, as long as the subterfuge used is not one likely to produce an untrue statement." *Oursbourn*, 259 S.W.3d 182. However, even misrepresentations that do not rise to the level of implicating Due Process are relevant in determining the defendant's subjective mental state under general voluntariness. *Id.* at 181. The State contends that any misrepresentations about whether Cielencki actually failed the polygraph exam he was given and about the accuracy of polygraph results in general were not the type of misrepresentations likely to render a confession involuntary because they relate to the accused's connection to a crime. *See Green*, 934 S.W.2d at 100 (explaining that "[o]f the numerous types of police deception, a misrepresentation relating to an accused's connection to the crime is the least likely to render a confession involuntary").

However, viewing the evidence in the light most favorable to the trial court's determination, *see Story*, 445 S.W.3d at 732, the record supports the trial court's finding that Cielencki's statements were "the product of fear, intimidation," and "coercion," which "removed any possibility of voluntariness." Throughout the interrogation Cielencki explained that he understood Agent Upright to be an expert in polygraphs and that he understood Agent Upright to have explained that the polygraph was detecting the physical manifestations of memories in his body for a memory that he could not remember. The line of questioning that led to his confession

13

did not rely on accusing Cielencki of being a liar or hiding information from the interviewers, but rather, the conversation was articulated as the interviewers helping him access a memory that he could not remember.

Viewing the record in the light most favorable to the trial court's ruling and given the totality of the circumstances and the deference that we must afford to the trial court's fact findings, we cannot conclude that the trial court abused its discretion by determining that Cielencki's confession was not made voluntarily. Thus, we overrule the State's issues regarding the voluntariness of Cielencki's confession and related statements. Because we have concluded that the trial court did not err in excluding Cielencki's statements under the general voluntariness theory, we do not address whether he was in custody, whether the *Miranda* warnings were adequate, or whether the evidence also should have been excluded under a different theory of federal or State law. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.")

## CONCLUSION

We affirm the trial court's suppression order.

_____

Darlene Byrne, Chief Justice

14

Before Chief Justice Byrne, Justices Kelly and Theofanis
  Concurring Opinion by Justice Kelly

Affirmed

Filed:   January 9, 2025

Publish

15